IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| CLAYTON R. ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-01959 (AJT/IDD) |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Fairfax County School Board's ("Defendant" or "FCSB")

Motion for Summary Judgment, [Doc. No. 30] (the "Motion"). The Court held a hearing on the

Motion on June 16, 2026, following which it took the Motion under advisement. Upon

consideration of the Motion, the memoranda in support thereof, [Doc. Nos. 31, 35, 38], and in

opposition thereto, [Doc. Nos. 33, 37, 41], and for the reasons stated below, the Motion is

**GRANTED**.[1]

## I. BACKGROUND

Plaintiff Clayton Allen ("Plaintiff" or "Allen") brings claims of employment

discrimination against FCSB under Title VII based on his membership in a race-based protected

class and under the Uniformed Services Employment and Reemployment Rights Act

("USERRA"), 38 U.S.C. § 4301 *et seq.*, as a member of the armed forces. [Doc. No. 1]. Defendant

seeks summary judgment on all counts. [Doc. No. 30].

The following facts are undisputed, unless noted otherwise:

---

[1] Plaintiff has also filed a Motion for Leave to File Supplemental Exhibits and Pleading, [Doc. No. 36], which the Court grants.

A.  Plaintiff's Employment at Lake Braddock Secondary School

Plaintiff is an African American male who has been an active servicemember with the U.S. Army National Guard prior to and throughout his employment with Fairfax County Public Schools ("FCPS"). [Doc. No. 31] ¶ 6. On August 25, 2014, Plaintiff began his career with FCPS as a full-time, itinerant music, strings teacher at Lake Braddock Secondary School ("LBSS"). *Id.* ¶ 1. Plaintiff's duties included teaching, organizing and directing concerts, managing budgets, and facilitating extracurricular activities with the Lake Braddock Orchestra Boosters ("Boosters"), a separate nonprofit group that supports LBSS. *Id.* ¶ 3.

B.  Plaintiff's Performance at FCPS

1.  *Plaintiff's relationship with other teachers and the Boosters, and email communication issues*

Following his first year of employment at FCPS, Plaintiff received on June 10, 2015, his annual "summative evaluation," which gave him an overall rating of "effective" with the following explanation concerning his professionalism:

> As a consistent area of growth throughout the school year, [Plaintiff] needs to focus on continued collaboration with the lead Orchestra teacher, in addition to collaborating with the other members of the Performing Arts department. With a new lead Orchestra teacher coming to Lake Braddock next year, he needs to meet weekly with his colleague so clear lines of communications are maintained. (Professionalism).

*Id.* ¶ 7 (citing [Doc. No. 31-8], Def. Ex. H at 280–85).

Beginning in 2017, Plaintiff began receiving summary memoranda, which are non-disciplinary "coaching memos" on topics related to his performance. *Id.* ¶¶ 9–10. In December 2017, Plaintiff's evaluator Alka Howard ("Howard") issued a summary memo documenting their conversation addressing Plaintiff's "continued pattern of being late for work" and a concern about Plaintiff's "communication with [his] colleague," another orchestra teacher. *Id.* ¶ 11 (citing [Doc. No. 31-8], Def. Ex. H at 34). On April 5, 2019, Howard issued Plaintiff another summary memo

2

documenting two conversations concerning "numerous disagreements and conflicts" with the high school orchestra teacher (Isaac). *Id.* ¶ 12 (citing [Doc. No. 31-8], Def. Ex. H at 35–36). Following another meeting with Plaintiff on April 25, 2019, Howard issued a third summary memo, in which she wrote that Plaintiff and Isaac's "constant complaining about each other" fostered a "negative work environment," and documented their agreement that Plaintiff and Isaac could both continue working at LBSS for another year if they worked independent of each other with an expectation that they would "foster a positive environment by working in a professional and collaborative manner." *Id.* ¶ 13 (citing [Doc. No. 31-8], Def. Ex. H at 39–40). As evidence of his disparate treatment relative to Isaac because of their disagreements, Plaintiff points to Isaac's remaining in their previously-shared larger office space, while Plaintiff was moved to a "significantly smaller office that was essentially a converted janitorial space." [Doc. No. 33-1] ¶¶ 46–49.

During the 2019–20 school year, Plaintiff was assigned to co-teach a high-school class with Isaac, in addition to his middle school classes. [Doc. No. 31] ¶ 14. On December 6, 2019, Plaintiff's direct supervisor Lindsay Kearns ("Kearns"), an Associate Principal, issued a summary memo documenting her conversation with Plaintiff about performance issues, including Plaintiff's changing plans for his co-taught class with Isaac while Isaac was on leave, and providing instruction for a class that was not assigned to him. *Id.* ¶ 15 (citing [Doc. No. 31-8], Def. Ex. H at 42). Kearns admonished Plaintiff during that meeting for "unprofessional behavior," and advised him that his actions violated Regulation 4293.5 (Dismissal-Definition of Just Cause)[2] and did not meet FCPS's expectations for Professionalism, a standard on which teachers are rated in their

---

[2] Regulation 4293.5 (Dismissal-Definition of Just Cause) defines incompetency as just cause for dismissal and consists of a "failure to make reports, follow instructions, or perform duties," and "failure to work well with other people and to be a constructive team member." *See* [Doc. No. 31-8], Def. Ex. H at 1. Additionally, Regulation 4293.5 states that "[u]nprofessional behavior" and "[n]oncompliance with the regulations and policies of the School Board, the state Board of Education, or the Code of Virginia," provide just cause for dismissal. *Id.* at 2–3.

evaluations. *Id.* In December 2019, Kearns issued another summary memo about another issue Plaintiff had with Isaac, and during two other meetings in December 2019, the principal Daniel Smith ("Smith") advised Plaintiff that the noted concerns about his professionalism would be reflected in his evaluation for that school year. *Id.* ¶¶ 16–17.[3]

Plaintiff's 2019–20 performance evaluation, completed by Kearns, rated Plaintiff as "Ineffective" in the area of professionalism, noting that the "areas of concern [were] specifically related to [Plaintiff's] ability to collaborate with the other Orchestra director, the willingness to be a positive team player, and his openness to feedback and criticism." *Id.* ¶ 18 (citing [Doc. No. 31-8], Def. Ex. H at 52–54). Plaintiff received an overall rating of "Developing/Needs Improvement" for the 2019–20 academic year. [Doc. No. 31-8], Def. Ex. H. at 54.

During the 2020–21 academic year, Plaintiff was assigned to teach five middle school orchestra classes.[4] [Doc. No. 31] ¶ 20. During this academic year, all teachers worked remotely until February 2021 due to COVID-19. *Id.* ¶ 21. Plaintiff was additionally on approved military leave from October 8, 2020 – April 30, 2021 and May 4–31, 2021. *Id.* ¶ 21.

On June 8, 2021, the Assistant Principal Jennifer Harris ("Harris"), who was Plaintiff's direct supervisor at the time, issued a summary memo to memorialize a June 1, 2021 meeting concerning miscellaneous issues that had arisen following Plaintiff's return from military leave. *Id.* ¶¶ 22–23. Harris also communicated an expectation that all mass emails sent by the Performing Arts Department be reviewed by Harris before being sent out. [Doc. No. 31-8], Def. Ex. H at 59–62.

---

[3] Although Plaintiff does not dispute the substance of these reprimands, he characterizes the issues they addressed as "quite harmless." [Doc. No. 33] ¶¶ 15–17.

[4] It is disputed amongst the parties whether Plaintiff was also assigned to high school classes during the 2020–21, *see* [Doc. Nos. 31, 33] ¶ 20; however, this dispute is immaterial for the purposes of this Motion.

On June 25, 2021, Harris advised that she had recommended Plaintiff's reappointment for the 2021–22 school year, but she identified professionalism as an area of concern, and therefore recommended Plaintiff's participation in "FCPS' voluntary Colleague Assistance Program," to commence at the start of the 2021–22 academic year. *Id.* at 58.

In November 2021, during the 2021–22 academic year, Harris issued two summary memos to Plaintiff concerning his lack of timely attendance, concerns about his unprofessionalism toward other employees, and an issue about Plaintiff's email exchange between Plaintiff, Isaac, and the Boosters, with various parents copied, in which Isaac accused Plaintiff of plagiarizing content, followed by a heated written exchange, which Harris found "cast the LBSS in a very negative light." [Doc. No. 31] ¶¶ 25–26 (citing [Doc. No. 31-8], Def. Ex. H at 66–77). Following this email exchange incident, Plaintiff was again directed not to send group email messages to students, staff, parents, and the Boosters without administrator permission, and Harris reiterated an "expectation" to "maintain a commitment to professionalism and communicate in ways that are constructive and effective." [Doc. No. 31-8], Def. Ex. H at 72.[5] The summary memoranda informed Plaintiff that his conduct violated Regulation 4293.5 and was not "in line with FCPS Performance Standard 6: Professionalism." *Id.* at 65, 72. Isaac was issued a similar summary memo for this incident. *Id.* at 73.

On February 11, 2022, Plaintiff was issued a summary memo for sending an email communication to middle school orchestra parents without prior approval, and was again informed that his conduct failed to meet FCPS policies, regulations, and guidelines. [Doc. No. 31] ¶ 29 (citing [Doc. No. 31-8], Def. Ex. H at 78–82).

---

[5] Plaintiff does not dispute the substance of the emails but contends that Isaac instigated the email exchange and it was Isaac's conduct, not Plaintiff's conduct that "cast the LBSS in a negative light." [Doc. No. 33] ¶ 26.

On April 13, 2022, Plaintiff received a summary memo regarding various concerns, including Plaintiff's absence from a scheduled meeting, his failure to follow instructions with respect to the timing of mid-year assessments of students and his additional unapproved communications sent to families. *Id.* ¶ 30 (citing [Doc. No. 31-8], Def. Ex. H at 88–91).

On May 27, 2022, at the end of the 2021–22 academic year, Plaintiff was issued a summary memo concerning complaints LBSS had received from the president of the Boosters about Plaintiff. *Id.* ¶ 38. Plaintiff was directed to "repair the fractured relationship that exists between [Plaintiff] and the [Boosters]." *Id.* ¶ 39.

Overall, for the 2021–22 school year, Plaintiff received an "Ineffective" rating with respect to professionalism, and an overall rating of "Developing/Needs Improve[ment]" on both his midyear and summative review. [Doc. No. 31-8], Def. Ex. H at 104, 108. Harris recommended only Plaintiff's "Conditional Reappointment" for the following (2022–23) school year. *Id.* at 107. In accordance with Regulation 4440.13, Harris advised Plaintiff that his salary step would remain the same due to his conditional reappointment summative rating, and an intervention team would be formed for the 2022–23 school year to assist Plaintiff with his professionalism. [Doc. No. 31] ¶ 33.

Between March and August 2022, Plaintiff was informed about some finance related concerns, including accounting discrepancies on orders Plaintiff had placed and an overdrawn account.[6] *Id.* ¶¶ 49–50. As of August 16, 2022, at the beginning of the following 2022–23 school year, when Plaintiff met with Kearns and Assistant Superintendent Penny Gros ("Gros"), Plaintiff

---

[6] Plaintiff submits that the issues involved "reconciliation of transactions and accounting records, not an absence of funds." *Id.* ¶ 50.

still had several financial items outstanding, and when asked about them, "ple[d] the fifth." *Id.* ¶¶ 51–52.[7]

On August 16, 2022, following an email that Plaintiff sent for LBSS administrative approval proposing to terminate the school's relationship with the Boosters, Plaintiff met with Kearns and Gros, where Gros communicated an expectation that Plaintiff would work collaboratively with the Boosters, directed Plaintiff to outline a plan for repairing his relationship with the Boosters, and informed Plaintiff that the failure to do so could result in a recommendation for his dismissal. *Id.* ¶¶ 40–43.[8]

On September 7, 2022, Teri Hampton ("Hampton"), the Associate Principal and Plaintiff's direct supervisor at the time, convened an Intervention Team meeting, led by Patti Brown ("Brown"), to assist Plaintiff in meeting the standard of Professionalism. *Id.* ¶ 36.

On September 13, 2022, Plaintiff received a summary memo stating that Plaintiff's conduct at the above-mentioned August 16, 2022 meeting, coupled with his failure to meet deadlines regarding financial obligations, and "fractured relationship with" the Boosters, violated the regulations, policies, and guidelines. [Doc. No. 31-8], Def. Ex. H at 140–41.

On October 14, 2022, Plaintiff received another summary memo concerning an email he sent the Boosters, following which Plaintiff sent an apology email to the Boosters board. [Doc. No. 31] ¶¶ 45–46.

On December 8, 2022, Hampton issued a Reprimand to Plaintiff about continuing concerns with Plaintiff's failure to work collaboratively with the Boosters and to follow their financial

---

[7] Although Plaintiff contends that he completed the outstanding items as soon as possible upon return from military duty, *id.* ¶ 51, Defendant contends Plaintiff returned from military duty on March 31, 2022, and therefore could have completed the outstanding items before the end of the 2021–22 school year, [Doc. No. 35] at 6. When precisely Plaintiff returned from military duty and when he completed the outstanding tasks is unclear on the present record.

[8] Plaintiff contends that, at the advice of his union counsel, he opted to "plead the fifth" when asked why he wanted to terminate the relationship with the Boosters. [Doc. No. 33] ¶ 42.

protocols, stating that "[a]ny further demonstrations of conduct that do not comply with FCPS policies, regulations, and guidelines and do not reflect positively on Lake Braddock will result in more severe disciplinary action, up to and including a recommendation for dismissal." *Id.* ¶ 48. The Reprimand stated that Plaintiff's "pattern of unprofessional behavior" would be noted in his performance evaluation for the 2022–23 school year." *Id.*

### 2. *Plaintiff's Entry into the LBSS Building*

In December 2022, while Plaintiff was on military leave, Plaintiff entered the LBSS building in the early hours of the morning, *id.* ¶¶ 53–55, purportedly to "work on lesson plans for the following week, which he did at an unusual hour because he had military drill[s] that weekend." [Doc. No. 33] ¶ 55. On January 3, 2023, Hampton met with Plaintiff to discuss his entry into LBSS, and on January 25, 2023, Plaintiff was issued a Reprimand for his "unauthorized access and entrance" into LBSS. [Doc. No. 31] ¶¶ 53–55. The Reprimand noted that during his meeting with Hampton, Plaintiff asked why he was being questioned for being in the building during off hours and was reminded that it had been communicated to him at least four times in writing that administration approval was necessary to access the building during off hours.[9] *Id.* (citing [Doc. No. 31-8], Def. Ex. H at 161–63).

On January 17, 2023, Brown issued a memorandum that "progress has been noted" in certain areas but that "continued improvement" was needed in other areas, including that Plaintiff needed to "utilize effective communication strategies with colleagues, booster organization, and families;" "write emails in a professional manner'" and "collaborate with colleagues." *Id.* ¶ 37.

---

[9] In his Opposition, Plaintiff contends that whether his access was "unauthorized" is disputed, *id.* ¶ 55, but he does not cite to anything in the record to support any contention that his entry was authorized. Moreover, the Reprimand issued to Plaintiff in the record is an email dated May 25, 2021, which Plaintiff does not dispute receiving and which advised, "we do require that if you need access to instructional spaces and/or offices for any reason while on approved leave, you must make those arrangements in advance." [Doc. No. 31-8], Def. Ex. H at 166. The email references five instances on which Plaintiff accessed instructional spaces without prior approval. *Id.*

On January 31, 2023, Plaintiff met with Hampton for his mid-year evaluation in which he received a rating of "Ineffective" for the standard of Professionalism, an overall rating of "Developing/Needs Improvement," and a recommendation of "Do Not Reappoint." *Id.* ¶ 57; [Doc. No. 31-8], Def. Ex. H at 178, 180, 182. That evaluation stated that Plaintiff "continues to use questionable judgment in his ability to follow policies and protocols established by FCPS" and "continues to disregard the approval process, which has led to [LBSS] accruing a financial burden and creating safety concerns due to his actions." [Doc. No. 31] ¶ 57.

Before beginning his approved period of military leave on February 23, 2023, Plaintiff met with Kearns, who advised him that there were concerns about Plaintiff's reported request to students to pay for snacks when he had an allocated $50 for snacks with the option to request additional funds if needed. *Id.* ¶¶ 59–60. At that meeting, Plaintiff said he did not know what Kearns was referring to and told Kearns he spent his own money but did not deny receiving funds from students. [Doc. No. 31-8], Def. Ex. H at 185.[10] In an email recap of the meeting, Kearns wrote that she was "concerned about the continued pattern of behavior and [Plaintiff's] failure to meet the expectations of FCPS and [LBSS]." *Id.*

### 3. *Plaintiff's Transfer*

On June 6, 2023, Kearns recommended to Assistant Superintendent of Human Resources, Sherry A. Wilson ("Wilson") that Plaintiff be administratively transferred under Regulation 4240.6(IV)(A), citing Plaintiff's "unauthorized access and entrance into [LBSS] while on military leave and during non-business hours; failure to adhere to communication protocols; failure to foster respectful and professional relationships with parents, students, colleagues, and the

---

[10] In his Declaration, Plaintiff contends that he did not collect money from students but spent $300 of his own funds on snacks. [Doc. No. 33] ¶ 59.

[Boosters] to ensure program success; and failure to adhere to financial policies, regulations and procedures." [Doc. No. 31] ¶¶ 61–62.

As part of her decisional process, Wilson testified that she reviewed the many disciplinary letters and summary memoranda and observed "a pattern of behavior that existed by looking at all of the memorandums, all of the summary memorandums, as well as the disciplinary letters that were reviewed over time." *Id.* ¶ 64. Prior to making her decision, Wilson also met with Plaintiff, together with his counsel and Division Counsel Ellen Kennedy. *Id.* ¶ 65. Although Plaintiff characterizes as a "key disputed fact" the "various accusations" Wilson allegedly made against him at that meeting, where he was given an opportunity to respond to his disciplinary record, he does not point to anything beyond his own declaration that calls into question the factual accuracy of the record or the Defendant's belief in the accuracy of that record. [Doc. No. 33] ¶ 68. Although the August 4, 2023 meeting with Plaintiff "substantiated her decision to approve the recommended transfer," Wilson testified that her decision was based on both her review of records as well as her meeting with Plaintiff. [Doc. No. 31] ¶ 65.

On August 9, 2023, Wilson issued a letter to Plaintiff, granting Kearns' request to transfer Plaintiff, effective August 11, 2023, to Fort Belvoir Upper School, an elementary school. [Doc. No. 31] ¶ 70. As part of the transfer, Wilson upgraded Plaintiff from "Step 10" to "Step 13," increasing his base salary from $81,088 to $91,266, taking into account that Plaintiff would no longer be eligible to earn stipends for extracurricular activities, which was $1,749 for the 2022–23 academic year.[11] *Id.* ¶¶ 69–71. Wilson testified that she did not transfer Plaintiff as "retaliation" for his complaints against FCPS, and that neither Plaintiff's military status nor race played any role in her decision to transfer him. *Id.* ¶ 72. Plaintiff testified that he thought Wilson's decision

---

[11] Plaintiff submits that in his prior position, he also had the opportunity to earn other stipends, such as $1,600 per year for the high school musical and $250 per year for festival holding. [Doc. No. 33] ¶ 69.

was a retaliatory measure for his military service but conceded that he did not believe Wilson's decision was racially motivated. [Doc. No. 31-3], Def. Ex. C at 178–89.

4. *2024–25 and 2025–26 Academic Years*

Following Plaintiff's transfer on August 11, 2023, Plaintiff was on military leave until August 11, 2024, [Doc. No. 31] ¶ 74; and though not clear from the current record, Plaintiff appears to have been on military leave and therefore absent for the entirety of the 2023–24 school year. When he returned to the FCPS for the 2024–25 academic year, which followed Plaintiff's military leave, Plaintiff was assigned, consistent with the August 2023 transfer decision, to Laurel Ridge Elementary School on Monday and Tuesday mornings, to Fairview Elementary School on those afternoons, to Orange Hunt Elementary School on Wednesday, Thursday, and Friday mornings and to Hunt Valley Elementary School on those afternoons. *Id.* ¶ 77. Laurel Ridge Elementary School and Fairview Elementary School are 3.4 miles from each other and Orange Hunt Elementary School and Hunt Valley Elementary School are 0.7 miles from each other. *Id.* Plaintiff taught at these schools and made these drives for a few weeks in August 2024 before returning to military leave for the balance of the 2024–25 school year, as well as the 2025–26 school year. *Id.* ¶ 80. As a result, he has been on military leave continuously since September 1, 2024 until the present. *Id.* ¶¶ 78, 80.[12]

---

[12] Even though he remained on military leave and did not teach during the 2025–26 academic year, Plaintiff was assigned to Riverside Elementary School on Monday, Thursday, and Friday mornings and to Fort Belvoir Upper School on those afternoons. [Doc. No. 31] ¶ 79. Those schools are 6.2 miles from each other. *Id.* Plaintiff was also assigned to Washington Elementary School on Tuesday and Wednesday mornings and to Waynewood Elementary School on those afternoons. *Id.* Those schools are 4.5 miles from each other. *Id.* Because of his military leave absence, Plaintiff did not actually drive to any those schools and does not dispute any of his assignments or their respective distances from each other but "expects he would have had to drive much more than that." [Doc. No. 33] ¶¶ 77–79.

On June 12, 2026, Plaintiff received an email with the tentative assignments for the 2026–27 academic year, on which Plaintiff was not listed, but which noted that itinerant teachers may not receive the specifics of their schedule until later in the summer. [Doc. No. 37-1] at 15.

C. Plaintiff's Formal Grievances to FCPS

Plaintiff has filed a declaration representing that he "repeatedly rais[ed] concerns" regarding "unequal treatment, favoritism, exclusion from opportunities, and the manner in which conflicts within the orchestra program were being addressed by administrators." [Doc. No. 33-1] ¶ 124.[13] These include a formal grievance submitted on May 1, 2019, documenting Plaintiff's belief that Isaac was being favored; and a formal complaint in 2020 alleging race discrimination and unequal treatment. *Id.* ¶¶ 124–65. Plaintiff submits that after he submitted his complaints, he "observed . . . a substantial increase in administrative scrutiny," including for "[r]outine aspects of [his] work." *Id.* Beyond his statements in his declaration, Plaintiff does not point to any record evidence about these complaints, or discuss any specific instances of this alleged increased scrutiny.

On November 4, 2025, Plaintiff filed this action asserting four claims for relief: (1) race discrimination in violation of Title VII (Count I); (2) retaliation in violation of Title VII (Count II); (3) discrimination based on military service in violation of USERRA (Count III); and (4) retaliation for exercise of his USERRA rights (Count IV).

## II.   LEGAL STANDARD

Summary judgment should be granted when no genuine dispute of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the

---

[13] Plaintiff does not state to whom he submitted these concerns, and he has not presented any supporting documentation of these complaints. *See* [Doc. No. 33-1] ¶¶ 124–165.

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To prevail, the movant must show that the adverse party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

On summary judgment, "[t]he facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Racklin v. Zeta Global Corp.*, 628 F. Supp. 3d 625, 639 (E.D. Va. 2022). Once the moving party establishes "the absence of a genuine issue of material fact," the burden shifts to the party opposing summary judgment who must "go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 323–24 (quotations omitted). Evidence that "is merely colorable, or is not significantly probative" does not defeat summary judgment, *Anderson*, 477 U.S. at 249–50 (citation omitted), and the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted).

## III.   DISCUSSION

A. Title VII Claims – Counts I (race discrimination) and II (retaliation)

Plaintiff brings race-based discrimination and retaliation claims pursuant to Title VII (Counts I, II). Title VII prohibits employers from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment because of such individual's . . . race," 42 U.S.C. § 2000e-2(a)(1), and further makes it unlawful to retaliate against an employee for asserting their rights under Title VII, *id.* § 2000e-3(a).

13

Where a plaintiff lacks direct evidence of discrimination or retaliation, a plaintiff may proceed under the *McDonnell Douglas* burden-shifting framework to establish their discrimination or retaliation claim. *See Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649 (4th Cir. 2021); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000) ("The *McDonnell Douglas* burden-shifting scheme applies in analyzing retaliation claims under Title VII."). Pursuant to this framework, once the plaintiff establishes a prima facie case of discrimination or retaliation, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. *Sempowich*, 19 F.4th at 650. The ultimate burden of persuasion "remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000) (internal citations and quotation marks omitted).

### 1. *Title VII race discrimination claim*

To establish a prima facie case for race discrimination, the plaintiff must prove four elements: "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) the adverse employment action occurred 'under circumstances giving rise to an inference of unlawful discrimination.'" *Johnson v. Balt. City*, 163 F.4th 808, 815 (4th Cir. 2026) (quoting *Wannamaker-Amos v. Purem Novi Inc.*, 126 F.4th 244, 255 (4th Cir. 2025)). The fourth element can be established with evidence that "similarly-situated employees outside the protected class received more favorable treatment." *Id.*

Defendant argues that Plaintiff cannot satisfy the second and fourth elements of his prima facie case. [Doc. No. 31] at 27–29.[14] In opposition, Plaintiff argues that he was fulfilling his employer's legitimate expectations and that there can be drawn a reasonable inference of

---

[14] The parties do not dispute that Plaintiff, an African American male, is a member of a protected class, and Defendant has conceded that Plaintiff's re-assignment to different schools constitutes an adverse action for the purposes of his Title VII claims. [Doc. No. 31] at 19 n.4, 27–29.

discrimination because even though Wilson was not motivated by racial animus, she acted upon Kearns' recommendation who was aware of Plaintiff's repeated complaints of race discrimination. [Doc. No. 33] at 20–21. He also points to the disparate treatment as between him and Isaac. *Id.*

With respect to the second prong, Plaintiff has failed to present facts that support a reasonable inference that he was meeting his employer's legitimate job expectations. Plaintiff contends that there are many material disputes concerning the issues on which he was reprimanded that ultimately led to his transfer and that many of the issues for which he was criticized were "quite harmless" and irrelevant to the ultimate question of whether Plaintiff was meeting FCPS's legitimate job expectations, all of which require a jury to make factual and credibility determinations. But in judging whether an employee was meeting the legitimate expectations of his employer, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000). And as the Fourth Circuit has repeatedly held, when "an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 315 (4th Cir. 2001) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).

Here, Defendant has presented extensive detailed documentary evidence that from its perspective Plaintiff was underperforming, as reflected in the various summary memoranda about Plaintiff's performance issues, Plaintiff's performance evaluations stating that he was "ineffective" in the area of professionalism during the 2019–20, 2021–22, and 2022–23 academic years, and several Reprimands issued to Plaintiff documenting the school's concern about his professionalism. As discussed above, many of these communications noted that Plaintiff's actions

violated regulations and policies and could result in disciplinary action, including termination.[15]

Plaintiff has not presented any evidence from which it could reasonably be inferred that these performance issues were not legitimate concerns from the employer's perspective.

Plaintiff argues that the only issues the school had with him were with his "professionalism" and that, as reflected in his performance evaluations, he excelled in other areas of performance. [Doc. No. 33] at 20. Even assuming that Plaintiff excelled at teaching music, Plaintiff has failed to put forward any facts to establish a material dispute about whether from his employer's perspective he was underperforming in the professionalism category. In that regard, while Plaintiff argues, supported solely by his own declaration, that there are material disputes about whether he was late on his financial obligations, whether he collected money from students to pay for snacks, and whether there was an expectation that he not enter the school after hours without permission,[16] he does not (and cannot) dispute that the Defendant, which documented in great detail these performance issues, considered them significant and material to his continued employment.[17] For example, Plaintiff does not dispute that his friction with Isaac and the Boosters were noted in his annual performance evaluations as support for Plaintiff's low professionalism

---

[15] For instance, in a Reprimand letter dated January 25, 2023 concerning Plaintiff's access to the building after hours, Plaintiff was informed that "[a]ny further demonstrations of conduct that do not comply with FCPS policies, regulations, and guidelines and do not reflect positively on Lake Braddock will result in more severe disciplinary action, up to and including a recommendation for dismissal." [Doc. No. 31-8], Def. Ex. H at 195.

[16] During his employment at LBSS, Plaintiff typically received an "effective" rating in each of the other categories of his review. *See, e.g.*, *id.* at 169.

[17] Plaintiff's immaterial contention that there are disputes concerning the underlying facts pertaining to these issues is also, in many instances, unsupported by the record. For example, what Plaintiff characterizes as a "material dispute" about whether his access to the building in December 2023 was unauthorized is directly contradicted by another document in the record that Plaintiff does not address or dispute, dated May 25, 2021, which advised him that FCPS "requires" him to seek prior approval "to access to instructional spaces and/or offices for any reason while on approved leave." *Id.* at 166. That email, written from Smith to Plaintiff, further references a previous conversation on January 26, 2021, during which Kearns advised Plaintiff of this policy. *Id.* Plaintiff cannot create a genuine dispute of material facts by self-serving declarations unsupported by the evidentiary record. *Scott v. Harris*, 550 U.S. 372, 378 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 438 (4th Cir. 1999) (district court appropriately disregarded affidavit in considering summary judgment motion because it contradicted deposition testimony).

16

ratings or that on several occasions, he was informed in summary memoranda that his actions violated FCPS Regulation 4293.5, which provides that the "failure to make reports, follow instructions, or perform duties" and the "failure to work well with other people and to be a constructive team member," can be "just cause" for dismissal. *See* [Doc. No. 31-8], Def. Ex. H at 42–43 (December 6, 2019 memorandum documenting concerns about Plaintiff's relationship with Isaac); *id.* at 64–65 (November 16, 2021 memorandum documenting unprofessionalism in Plaintiff's relationships with colleagues); *id.* at 78 (February 11, 2022 memorandum documenting concerns about sending out unapproved email messages). Given this undisputed evidence, Plaintiff fails as a matter of law to present evidence sufficient to establish that he was meeting his employer's legitimate expectations. *See McZeke v. Horry Cnty.*, 609 F. App'x 140, 144 (4th Cir. 2015) (a plaintiff fails at summary judgment stage to establish that he met the employer's legitimate expectations "where the employer had previously reprimanded the plaintiff 'based on concrete, specific observations,' and the plaintiff continued to perform contrary to those expectations") (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510 (4th Cir. 2006)); *see also King v. Rumsfeld*, 328 F.3d 145, 147–49 (4th Cir. 2003) (holding no genuine dispute of material fact concerning plaintiff's performance where employer offered evidence "chronicling in detail [plaintiff's] poor performance and his supervisors' numerous concerns"). And despite contending as such, Plaintiff has failed to demonstrate why Defendant's "proffered expectation[s] [were] not, in fact, legitimate at all." *Cf. Inman v. Klockner Pentaplast of Am., Inc.*, 347 F. App'x 955, 960 (4th Cir. 2009) (reversing grant of summary judgment because plaintiff presented sufficient evidence where jury could conclude that deficiencies claimed by defendant "were exaggerated to cover up the [improper] motivation . . . and that any such deficiencies were not sufficient to prevent his performance from being adequate").

17

As to the fourth prong of Plaintiff's prima facie case for race discrimination, that is, whether the adverse employment action occurred "under circumstances giving rise to an inference of unlawful discrimination," Plaintiff concedes that Wilson, the decisionmaker responsible for his transfer from LBSS, did not base her decision on race. [Doc. No. 33] at 21. "[T]o plausibly allege a violation of Title VII, an employee must identify a decisionmaker with discriminatory intent who decided to take an adverse action." *Harris v. Integrity Mgmt. Consulting, Inc.*, No. 119CV900RDAIDD, 2021 WL 1438310, at *4 (E.D. Va. Mar. 16, 2021) (citing *Hill v. Lockheed Martin Logistics Mgmt.*, *Inc.*, 354 F.3d 277, 286 (4th Cir. 2004)). Rather, Plaintiff argues that Kearns, who recommended Wilson's transfer, was motivated by race, but Plaintiff has submitted no evidence from which a reasonable factfinder could find that Kearns was motivated by race in recommending Plaintiff's dismissal. And although Plaintiff alleges that Isaac, a Caucasian music teacher was treated more favorably, Plaintiff has failed to put forward any evidence that Isaac— or any of his Caucasian colleagues—had a comparable disciplinary record. If anything, the record, which includes an identical summary memo issued to Isaac for engaging in a public unprofessional email exchange, supports an inference that Plaintiff was treated comparably to his Caucasian colleague with respect to comparable conduct. [Doc. No. 31] ¶ 27. For these reasons, Plaintiff has failed to establish the second and fourth prongs of a prima facie case for race discrimination.

Even if Plaintiff could establish a prima facie race discrimination claim, Defendant has clearly met its burden of proffering legitimate, nondiscriminatory reasons for the adverse employment action. As discussed above, Defendant dealt with Plaintiff based on long-documented difficulties with his position at LBSS that warranted from his employer's perspective a transfer to an elementary school setting. And Plaintiff has failed as a matter of law to produce sufficient evidence that this legitimate, non-discriminatory reason for his treatment was a pretext for race

18

discrimination. *See Darvishian v. Geren*, 404 F. App'x 822, 828 (4th Cir. 2010) (plaintiff failed to prove that Defendant's explanation is pretextual because he did not "demonstrat[e] that the defendant's explanation is 'unworthy of credence'" or "offer[] circumstantial evidence sufficiently probative of the issue of discrimination") (quoting *Reeves*, 530 U.S. at 148); *see also Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158 (4th Cir. 2024) (affirming summary judgment for defendant where "review of the record reveals that no reasonable jury could find that [the plaintiff] was terminated for any reason other than her" deficient performance).

For these reasons, Defendant is entitled to judgment as a matter of law on his race discrimination claim and its Motion is **GRANTED** with respect to Plaintiff's race discrimination claim pursuant to Title VII (Count I).

## 2. *Title VII retaliation claim*

Plaintiff alleges in Count II that he was retaliated against for opposing practices he reasonably believed were discriminatory. But that claim fails as a matter of law for essentially the same reasons as his race discrimination claim in Count I.

As with Plaintiff's race discrimination claim, Plaintiff must first make out a prima facie case of retaliation, which requires him to show "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Barnhill v. Bondi*, 138 F.4th 123, 132 (4th Cir. 2025) (quoting *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010)). If Plaintiff makes this showing, "the burden shifts to the employer to offer a legitimate, nonretaliatory reason for their adverse action." *Id.* at 138. Then, the burden shifts back to the employee "to prove by a preponderance of the evidence that the employer's purported reason is pretext for intentional retaliation." *Id.* (internal quotation marks omitted).

19

Plaintiff asserts his transfer from LBSS to his elementary school assignments were retaliatory for complaints he submitted between May 1, 2019 and 2020. As an initial matter, Plaintiff fails to allege any detail about these generalized complaints. *See* [Doc. No. 33-1] ¶¶ 124–65. More importantly, Plaintiff alleges to have made these complaints about discriminatory practices in 2020, three years before Wilson transferred Plaintiff to an elementary school on August 9, 2023. Without more, this three-year period between Plaintiff's protected activity and his transfer does not suffice to show the causal link needed for his prima facie case of retaliation. *See Hall Haggins v. Wilson Air Ctr., LLC*, 163 F.4th 872, 881 (4th Cir. 2026) (rejecting plaintiff's claim that one-month gap between protected activity and her discharge satisfied the causation element).[18]

Further attenuating any causal link is that the decision to terminate Plaintiff was made by Wilson, who testified under oath that her decision to transfer Plaintiff was based on her review of Plaintiff's employment record and a meeting with Plaintiff, from which she concluded that Plaintiff had consistently failed to follow directives. [Doc. No. 31-5] at 63, 69, 76–77, 95–96, 102. Again, Plaintiff does not challenge Wilson's stated motivation and concedes that Wilson, who was the final decisionmaker, did not base her decision to transfer Plaintiff based on any complaints he may have made about racial discrimination, *see Roberts v. Glenn Indus. Grp. Inc.*, 998 F.3d 111, 125 (4th Cir. 2021) (A "plaintiff cannot establish the causation element of a prima facie case where 'the relevant decisionmaker was unaware that the plaintiff had engaged in a protected activity.'").

---

[18] In his supplemental memoranda, Plaintiff contends that the June 12, 2026 email he received, in which he was not given an assignment for the 2027 academic year, supports a conclusion that FCPS retaliated against him for filing this lawsuit and asserting his rights under Title VII and USERRA. [Doc. No. 37]. However, as set forth in his supplemental affidavit, Plaintiff has been on extended military leave that is anticipated to extend at least until September 30, 2026. [Doc. No. 37-1] ¶¶ 6-7, 12. Given that there is no dispute that Plaintiff's current military leave is not scheduled to end until September 30, 2026, after the start of the 2027 school year, and that assignments in the June 12, 2026 email are not "final," particularly for itinerant teachers like Plaintiff, Plaintiff cannot establish that he suffered any adverse employment action, or that there is a causal link between the protected activity and the claimed adverse employment action. *See Barnhill v. Bondi*, 138 F.4th 123, 132 (4th Cir. 2025).

Rather, Plaintiff relies only on Kearns' recommendation that he be transferred to claim that his transfer was retaliatory for the filing of his complaints, ostensibly relying on what appears to be in substance a "cat's paw" theory without invoking that theory specifically. In that regard, Plaintiff contends that Kearns was "naturally aware" of his complaints, [Doc. No. 33] at 22, but he cites to no record evidence with whom Plaintiff's discrimination complaints were raised, and whether Kearns was even aware of these complaints. There is therefore insufficient evidence as a matter of law to establish that Kearns' recommendation to transfer Plaintiff was in retaliation for any complaints he may have made, or that Wilson was unduly influenced by that recommendation such that there is a "causal link between the protected activity and the employment action." *Barnhill*, 138 F.4th at 132.

Even if Plaintiff could establish a prima facie claim for retaliation, Plaintiff has failed to rebut as pretextual Defendant's legitimate non-retaliatory reasons for any adverse employment treatment.[19] In that regard, to demonstrate pretext, a plaintiff is required to demonstrate "both that the employer's reason was false" and that the adverse action would not have taken place "but for [the] employer's retaliatory animus." *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 246 (4th Cir. 2020). In other words, Plaintiff is required to demonstrate a dispute of material fact such that a jury could reasonably conclude that FCPS's retaliatory motives were the but-for cause of its decision to transfer Plaintiff to his elementary school assignment. *Id.* As discussed above, the undisputed record reflects that Plaintiff's consistent failure to follow directives, as documented in Plaintiff's annual performance reviews, two reprimand notices, and several summary memoranda, precipitated his transfer. And Plaintiff has put forward no evidence suggesting that the defendant's

---

[19]Although there is a substantial issue as to whether Plaintiff has suffered an adverse employment action by way of his transfer, Defendant has not raised that issue and the Court has therefore not considered that issue in connection with its rulings.

proffered non-retaliatory reason was not the real reason for his transfer or that he would not have been transferred but for retaliatory animus. *See Shipton v. Balt. Gas & Elec. Co.*, 109 F.4th 701, 708 (4th Cir. 2024) (holding plaintiff could not show pretext where employer's reason for adverse employment action was genuine, regardless of if "the reason was wise, fair, or even correct") (quoting *Adkins v. CSX Transp., Inc.*, 70 F.4th 785, 794 (4th Cir. 2023)).

For these reasons, Plaintiff has failed to meet his burden to establish a prima facie retaliation claim or demonstrate that Defendant's asserted non-retaliatory reasons for transferring Plaintiff were pretext for retaliation. Defendant is therefore entitled to judgment as a matter of law as to his retaliation claim and its Motion is therefore **GRANTED** with respect to Plaintiff's retaliation claim pursuant to Title VII (Count II).

B. USERRA Claims – Counts III (discrimination) and IV (retaliation)

USERRA "prohibits discrimination against persons because of their service in the uniformed services." *Butts v. Prince William Co. Sch. Bd.*, 844 F.3d 424, 430 (4th Cir. 2016) (internal quotation marks omitted); *see also* 38 U.S.C. § 4301. Relevant to this case, USERRA contains two paths to liability pursuant to 38 U.S.C. § 4311. *Kitlinski v. U.S. Dep't of Just.*, 994 F.3d 224, 229 (4th Cir. 2021). First, § 4311(a) "broadly prohibits discrimination in the hiring, rehiring, and retaining of servicemembers." *Id.* (quoting *Harwood v. Am. Airlines, Inc.*, 963 F.3d 408, 414 (4th Cir. 2020)); *see also* 38 U.S.C. § 4311(a). Second, § 4311(b) "prohibits employers from 'taking any adverse employment action against any person because such person has taken an action to enforce a protection afforded any person under USERRA or has exercised a right provided for in USERRA.'" *Id.* (quoting *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006)); *see also* 38 U.S.C. § 4311(b). Under either path, the employee first must show that his military status or his exercise of a right provided in USERRA, such as the taking of

military leave, was "a motivating factor" in the employer's decision. *Id.* If the plaintiff meets his initial burden of proof that their "military status was a motivating factor in the employer's decision," the burden of proof shifts to the employer, who can avoid liability with proof that "the action would have been taken in the absence of the employee's military status." *Hill*, 252 F.3d at 312; *see also* 38 U.S.C. § 4311(c).

First, Plaintiff claims that, in violation of Section 4311(a), FCPS discriminated against him when it reprimanded him for entering the building without authorization, and that his "military-service obligations were a substantial or motivating factor" in Defendant's decision to reprimand him and to transfer him from LBSS to an elementary school. [Doc. No. 1] ¶¶ 88–90. Second, Plaintiff claims that, in August 2023, after returning from military leave, Defendant violated Section 4311(b) by subjecting him to retaliatory "adverse employment actions, including placement at elementary schools" and that "Defendant's actions were motivated, at least in part, by Plaintiff's exercise of his USERRA rights." *Id.* ¶¶ 92–98.

Under USERRA, discriminatory motivation can be "inferred by an employer's expressed hostility towards servicemembers protected by the Act." *Harwood*, 963 F.3d at 415–16. But that hostility must be "connected in some way to the adverse employment action." *Id.* In *Harwood,* the Fourth Circuit affirmed the district court's dismissal of the plaintiff's USERRA claim, holding that the "few scattered comments" alleged to have been made "over 15 years prior to the allegedly discriminatory action" was insufficient to support a "reasonable inference" that the plaintiff's military service was a motivating factor in the employer's decision. *Id.*; *see also Workman v. Scenic Enter., Inc.*, No. 2:23-CV-00783, 2025 WL 72159, at *2 (S.D. W. Va. Jan. 10, 2025) (holding that temporal proximity between plaintiff's return from military service and employer's failure to give him work is not enough to survive summary judgment on USERRA claims).

Here, Plaintiff has failed as a matter of law to produce evidence, direct or circumstantial, from which a jury could reasonably infer that Plaintiff's military service was a "motivating factor" in the school board's decisions. There is no evidence that anyone ever expressed any sort of animosity or resentment for his military service or even made any comments about his military service or status. Defendant's complaints about Plaintiff's performance predate his absence due to his military service and are otherwise reflected in documented complaints unrelated to his military service or status, including summary memoranda, reprimands, multiple "Just Cause for dismissal" warnings and evaluations as assessed by five different evaluators over more than five years. *See Hill*, 252 F.3d at 312 (affirming summary judgment for employer where employee would have been fired anyways for performance-related issues).[20] In short, assuming Plaintiff suffered an adverse employment action for the purposes of USERRA, Plaintiff has failed as a matter of law to establish that his military status was a "motivating factor" in his treatment.[21] As a result, Plaintiff has failed as a matter of law to present evidence from which a reasonable jury could infer discriminatory or retaliatory animus by a civilian employer. *See Francis*, 452 F.3d at 307 (Summary judgment is appropriate when the plaintiff "simply presents *no* evidence, direct or

---

[20] In support of his USERRA, Plaintiff relies heavily on his Reprimand for entering his school building after hours without authorization while on military leave as support for his argument that his military service motivated Defendant's admonition of such conduct. But Plaintiff's Reprimand in connection with this incident was based on a policy, of which he was advised, that applied to all employees, and which he clearly violated. *See Kitlinski v. U.S. Dep't of Just.*, 994 F.3d 224, 229 (4th Cir. 2021) (USERRA cannot be used as a vehicle to "refuse to comply with his civilian employer's reasonable requests."). That Plaintiff happened to be on military leave when he violated his employer's policy by entering the building without the required authorization does not entitle him to "refuse to comply with [LBSS's] reasonable requests." *Id.*

[21] In substance, Plaintiff asks the Court to infer discriminatory motivation because Plaintiff had always performed well at his duties but that he was increasingly "being mobilized for extended periods of time," and a jury could infer that his "extended absence[s], rather than the complaints against him, were the true catalyst for his transfer to a position with fewer responsibilities and opportunities." [Doc. No. 33] at 13. Plaintiff supports this position by again pointing principally to his reprimand for entering the building without authorization while he was out on military leave as well as his lack of an assignment for the 2026–27 school year. But the premise of this position—that he always performed well—is belied by the record.

circumstantial, through which a rational trier of fact could find that" the defendant was motivated by an employee's military service) (emphasis in original).

For these reasons, Plaintiff cannot establish that his exercise of protected USERRA rights was a motivating factor behind Defendant's decision to transfer him, and Defendant is therefore entitled to judgment as a matter of law on Plaintiff's USERRA claims (Counts III, IV).

## IV.    CONCLUSION

For the reasons discussed above, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment [Doc. No. 30] be, and the same hereby is, **GRANTED** as to all Counts and this action is **DISMISSED**.

The Clerk is directed to forward a copy of this Order to all counsel of record and enter judgment in favor of Defendant pursuant to Fed. R. Civ. P. 56.


July 13, 2026
Alexandria, Virginia

Anthony J. Trenga
United States District Judge

25